189 N.J. Super. 185 (1983)
459 A.2d 701
PLAYBOY-ELSINORE ASSOCIATES, PLAINTIFF,
v.
DAVID L. STRAUSS, DEFENDANT.
Superior Court of New Jersey, Law Division Atlantic County.
February 22, 1983.
*186 Elliot L. Marvel and Russell P. Goldman for plaintiff (Elliott L. Marvel, attorney).
Howard W. Segal for defendant.
PERSKIE, J.S.C.
This matter presents for determination on first impression questions relating to the construction and application of that portion of the Casino Control Act which regulates the granting and issuance of credit at New Jersey casinos.[1] The parties have each moved for summary judgment, asserting the lack of any genuine issue of material fact. A review of the pleadings and affidavits submitted incident to the moving papers establishes that the issue is ripe for determination on a motion for summary judgment. R. 4:46-2; Judson v. People's Bank and Trust Co. of Westfield, 17 N.J. 67, 74 (1955).
The essential facts are not in dispute. On or about May 2, 1981 defendant applied for, and was granted, a "line of credit" at the casino hotel operated by plaintiff in Atlantic City. A "line of credit" approved by a casino hotel permits a patron to *187 receive, in accordance with established statutory and regulatory procedures, "cash or cash equivalents" in exchange for a personal check issued to the casino hotel. In this instance defendant sought and received a line of credit in the amount of $40,000.
Thereafter, defendant issued eight checks drawn against this line of credit. Each of the eight checks was in the sum of $5,000. Two of such checks were executed on January 10, 1982, four on January 22, 1982 and the remaining two on January 26, 1982. Each of the eight checks was executed at the gaming table where the defendant was gambling, and each was subsequently deposited and presented for payment by plaintiff. Each of the eight checks was, in due course, returned to plaintiff by defendant's bank marked "insufficient funds," and plaintiff's complaint seeking collection of the $40,000 debt evidenced by the checks ensued.
Plaintiff has established that the procedure then (as now) in effect at its casino hotel for the issuance of credit had previously been submitted to, and approved by, the Casino Control Commission, in accordance with the provisions of the Casino Control Act requiring prior approval of all systems of internal procedures and administrative and accounting controls, including, with particularity, "procedures for the cashing and recordation of checks exchanged by casino patrons."[2] In relevant part, the procedure is as follows:
1. A patron at a gaming table who desires to request an advance against a previously established line of credit notifies the dealer, who calls the pit clerk (sometimes also called a casino clerk). This pit clerk, or casino clerk, is a part of the accounting department, not a part of casino operations, and is accountable to the accounting department.
2. A patron completes a request slip setting forth his name, his mother's maiden name (apparently for purposes of identification), patron's date of birth, and the amount of credit requested. The pit clerk checks to verify that credit in this sum is available.
3. A counter check is prepared by the clerk in the pit, either manually or by computer. The clerk completes the check except for the patron's signature, presents it to the patron, and receives the signed counter check from the patron.

*188 4. The counter check is prepared in an original and four duplicates, each completed simultaneously. The original, a redemption copy, and an acknowledgment copy are each sent to the casino cashier through a pneumatic tube process. An accounting copy is retained by the pit clerk. The last copy, the "issuance copy", is given to the dealer or boxman, who lays it out on the table, exchanges the copy for chips, deposits the issuance copy into his cash drop box at the table, and transfers the chips in question to the patron.
The applicable portion of the statute[3] provides as follows:
No casino licensee ... may accept a check ... from any person to enable such person to take part in gaming activity as a player, or may give cash or cash equivalents in exchange for such check unless:
(1) The check is made payable to the casino licensee;
(2) The check is dated, but not post-dated;
(3) The check is presented to the cashier or his representative and exchanged only for a credit slip or slips which total an amount equal to the amount for which the check is drawn, which slip or slips may be presented for chips at a gaming table; and
(4) The regulations concerning check cashing procedures are observed by the casino licensee and its employees and agents.
The Casino Control Commission, pursuant to statutory mandate[4], has adopted regulations governing check cashing procedures. In relevant part, the regulations in effect in January 1982 provided as follows:[5]
For Counter Checks exchanged at a gaming table, the casino clerk[6] shall:
1. Examine the patron's identification credentials or perform such other procedures as required by the Casino licensee to ensure the patron's identification.
2. Determine the patron's remaining check cashing limit from the cashiers' cage.
3. Prepare the Counter Check for a patron's signature by recording, at a minimum, on the face of the original and all duplicates of the Counter Check, *189 with the exception of the acknowledgment copy which shall only have recorded on it the game and table number, or in stored data, the following information:
i. The name of the patron exchanging the Counter Check;
ii. The name of the patron's bank (required on the original copy only);
iii. The current date and time;
iv. The amount of the Counter Check expressed in numerals;
v. The game and table number;
vi. The signature of the casino supervisor authorizing acceptance of the check; and
vii. The signature of the preparer or, if computer prepared, the identification code of the preparer.
4. Place an impression on the back of the original Counter Check a restrictive endorsement "for deposit only" to the casino licensee's bank account.
5. Present the original and all duplicate copies of the Counter Check to the patron for signature.
6. Receive the signed Counter Check directly from the patron; the issuance copy, which is the equivalent of a Check Credit Slip, of the Counter Check shall be immediately and directly given to the dealer or boxman. In no instance shall the chips or plaques be given to the patron prior to the receipt of the issuance copy of the Counter Check by the dealer or boxman.
i. The original, redemption and acknowledgment copies of the Counter Check shall be expeditiously transported to the cashiers' cage where the original and redemption copies shall be maintained and controlled by the Check Bank Cashier;
ii. The accounting copy of the Counter Check, if manually prepared, shall be maintained and controlled at all times by the casino clerk; and
iii. The issuance copy of the Counter Check shall be deposited by the dealer or boxman in the drop box immediately after the issuance of chips or plaques to the patron.
Defendant raises, in essence, three challenges to the procedures adopted, pursuant to regulatory mandate, by plaintiff. He argues that:
1. Inasmuch as the person receiving the check must be the cashier or his representative, the individual who received the check must be designated in some formal fashion by the cashier as a part of the cashier's department. Insofar as the regulation expressly permits (in fact, requires) the check to be delivered to the casino clerk, as opposed to the "cashier or his representative", the regulation is invalid.
2. The statute requires that a check be exchanged "only for a credit slip ..." The plaintiff's procedure, and the regulation with which the procedure is consistent, requiring the credit slip to go to the dealer or boxman rather than to the patron are both violative of the statutory language and therefore invalid.

*190 3. The statute provides that a credit slip "may be presented for chips at a gaming table." The use of the word "may" suggests that the patron who receives the slip must be given the option to present the credit slip for chips, rather than be required to do so. To the extent that the regulation denies the patron the opportunity to make a decision as to whether the slip should be promptly exchanged for chips at the table, the regulation is invalid.
Plaintiff, in response, argues that both its procedures and the regulations pursuant to which the procedures were adopted are valid and in compliance with statutory requirements, and that defendant's checks are valid and enforceable under the provisions of the statute.
It is clear that the Casino Control Act prohibits the enforcement of any debt evidenced by a check "cashed, transferred, conveyed or given in violation of this act." N.J.S.A. 5:12-101(f). It is equally clear that our courts have insisted upon strict compliance with the statutory provisions, by reason of their comprehensive nature and by reason of the sui generis nature of these "gambling debts." Resorts International Hotel, Inc. v. Salomone, 178 N.J. Super. 598, 605 (App.Div. 1981). In the Salomone case some of the same questions presented here for decision were also raised, but were not decided in view of the determination that violations of subsections (b)(2) and (c) of the statute prevented enforcement of the debt evidenced by the checks. Salomone, supra at 602.
It is by now axiomatic that the casino industry has been invited to participate in the commercial life of the State of New Jersey pursuant to a statutory scheme that holds the industry and its practices to strict compliance with comprehensive requirements designed to create and maintain "public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." N.J.S.A. 5:12-1(b)(6); see, also, Knight v. Margate, 86 N.J. 374 (1981); Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325 (1981); Uston v. Resorts International Hotel, Inc., 89 N.J. 163 (1982), and In re Boardwalk Regency Corp. Casino License, 90 N.J. 361 (1982).
*191 Certainly, practices and procedures involved with the extension of credit by the casinos are among the most sensitive aspects of casino operations. Indeed, during the legislative deliberations on the Casino Control Act the State Commission of Investigation recommended to the Legislature that casinos should not be allowed to extend credit at all, both by reason of a concern for "illicit diversion of revenues  `skimming' as it is popularly called," the manner of collection of credit debts, and the "question of player protection." The Commission expressed the concern that "if a player must either put up cash or write out a check, he is less likely to exceed his own personal financial limitations than if he can readily obtain easy credit. Casino credit is particularly attractive, because it normally bears little or no interest and has a seemingly liberal repayment period. Its attractiveness has a significant potential, therefore, to cause a bettor to lose more than he can afford to." Report and Recommendations on Casino Gambling by the Commission of Investigation of the State of New Jersey (April 1977), at 1E-3E.
In rejecting the recommended prohibition of credit the Legislature was apparently influenced to a substantial degree by the conclusions of the Governor's Staff Policy Group on Casino Gambling, a special Task Force headed by then Special Assistant to the Attorney General, Robert P. Martinez. The Task Force was commissioned by Governor Byrne to make recommendations to the Legislature regarding the Casino Control legislation. In its final report, submitted February 14, 1977, the Staff Policy Group recommended permitting the extension of credit by casinos under tightly controlled regulations and concepts. Final Report, Staff Policy Group on Casino Gambling, at 34-36. The resulting legislation and the regulations adopted incident thereto reflect the sensitivity of the subject of casino credit. The particularized and extensive requirements governing credit transactions were obviously designed to respond specifically to the concerns raised by the State Commission of Investigation. The statutory and regulatory schemes must be considered as having been designed to accomplish several specific purposes, to *192 wit: (1) the creation of a well documented, traceable and efficient "paper trail" to allow both the internal casino management and the casino regulators easy and efficient access to all information respecting a credit transaction; (2) the prevention of "skimming" by the particularizing of the transaction, including the specified disposition of all papers and minimizing, if not eliminating, of the possibility of the transfer of "cash or cash equivalents" in exchange for anything other than a valid credit slip; (3) the requirement of prompt deposit, consistent with a mandated schedule, of all counter checks, and the rendering of these gaming debts legally enforceable in the courts, thereby allowing the casino regulators to monitor the process of "collecting" the debts, and (4) the requirement that the patron affirmatively request the extension of credit previously established and sign a check evidencing the same, in order to prevent a situation wherein the credit was extended, and a debt incurred, at the instance of the casino.
In essence, the issues presented in the within matter require a determination as to the validity of the regulations adopted by the Casino Control Commission, as I find and conclude that the credit practices and procedures employed in general by plaintiff, and in particular in the within case, fall squarely within the provisions of the applicable regulation. Indeed, as noted, plaintiff's procedures had been pre-approved by the Casino Control Commission, as required by statute.

A. Is the "casino clerk" the "representative" of the cashier?

The statute requires that a check submitted by a patron be presented "to the cashier or his representative." Defendant argues that this "representative" must be "designated in some formal fashion by the cashier as part of the cashier's department." I find this to be an overly restrictive construction of the statutory language and purpose. Clearly, the intent of this requirement is to assure the procedural integrity of the "paper trail" and to enable both the casino management and the regulators to maintain close and careful scrutiny of all credit *193 transactions through the use of one administrative office, to wit, that of the casino cashier. To this end the regulations[7] require the physical separation, by personnel and by function, of all cashiers' cage operations, and, in relevant part, establish that part of the function of the cage shall be to "receive ... checks ... from patrons," and "receive the original and redemption copies of counter checks." It is clear that the thrust of the regulatory scheme is to require all credit transactions to be administered through the cashiers' cage, and, to this end, the regulations specifically provide that the "casino clerk" who receives the application from the patron for casino credit, and who approves and extends that credit, "shall be the person ... to prepare, under the supervision and direction of the Cage Manager, documentation required for the ... request for credits and counter checks." N.J.A.C. 19:45-1.12(a). It is clear that this regulatory scheme is consistent with the intent and purpose of the statutory language, and with its literal reading as well, in that the "casino clerk" mandated by the regulation herein challenged to conduct the credit transaction with the patron is, in fact and in law, part of, and accountable to, the operations of the cashier. Accordingly, insofar as the challenged regulation requires the "casino clerk" to conduct the credit transaction with the patron, the regulation is a valid and appropriate exercise of the regulatory authority of the Commission.

B. May the credit slip be given directly to the dealer by the clerk or "must" the patron receive the slip and then elect to exchange it for chips or plaques?

Defendant's second and third challenges to the regulation are addressed to the requirement therein that the casino clerk give the issuance copy of the counter check, which is the equivalent of the credit slip, to the dealer or boxman rather than to the patron. As noted, defendant asserts that this process deprives *194 the patron of the ability to choose as to whether to present the credit slip to the dealer or not, and, in that regard, violates the statutory mandate that the check be "exchanged only for a credit slip which ... may be presented for chips...." (emphasis supplied).
The purpose of the statutory provision was to balance the commercial and operational advantages of a credit system with the regulatory concerns of assuring the integrity of credit transactions. The Governor's Staff Policy Group on Casino Gambling, supra, First Interim Report, December 7, 1976, at 3. The Legislature was apparently interested in establishing a structure that would permit a functional and convenient method for patrons to initiate a credit transaction while, as previously observed, assuring the uniformity and documentation of all such transactions. These goals are clearly advanced by the provisions of the challenged regulation, pursuant to which the patron submits a signed counter check; a credit slip is issued in exchange for the check, and the credit slip is immediately presented to the dealer for chips. Were the construction sought by defendant to be adopted, a patron could, after initiating the credit transaction and receiving the credit slip, leave the table with the slip, not having presented it for chips, thereby leaving a gaping hole in the documentation of the transaction. It would require comprehensive additional facilities to track when, at what table, in what amount  or even, perhaps, if  the customer presented the credit slip in exchange for chips. This would significantly alter and compromise the ability of the casino management and the regulatory structure effectively and precisely to document each transaction.
Nor is there any particularly compelling rationale for the position that defendant asserts. The opportunity for the patron to "make a decision" as to whether the credit slip is to be promptly exchanged for chips at the time the credit is issued, which opportunity is foreclosed by the procedure mandated in the regulation, is in fact ephemeral. The regulatory scheme *195 clearly requires that the patron apply for each extension of credit, and, of note, prohibits a patron from establishing a line of credit while sitting at the gaming table. The only credit transaction permitted at the table itself is the extension of credit previously approved. This procedure, designed to respond to the concerns that a system allowing credit would encourage patrons to gamble "imprudently,"[8] provides for the necessary opportunity for the patron to make his decision. To mandate another such decision literally within minutes, or even seconds, of the first, particularly in the context of the seriously adverse impact on the ability to document the transaction, would be inconsistent with the purpose and philosophy of the statute in assuring a simple and effective administration of this highly sensitive area.
The statutory provision that the credit slip "may" be presented for chips does not necessarily compel the conclusion that the slip also may not be so presented; it is far more consistent with the obvious intent of the statute to conclude that what the Legislature intended was that only a credit slip issued as required by regulation could be so presented, and that nothing else may be used to obtain chips on credit.
Accordingly, for the foregoing reasons, those provisions of the cited regulation which mandate the deposit of the issuance copy of the credit slip with the dealer or boxman prior to the transfer of chips or plaques to the patron are an appropriate and valid exercise of the regulatory authority of the Commission, and the checks issued pursuant to these procedures are valid and enforceable debts under the provisions of the Casino Control Act. The application of defendant for summary judgment shall be and is herewith denied. The application of plaintiff for summary judgment is herewith granted.
NOTES
[1] N.J.S.A. 5:12-101.
[2] N.J.S.A. 5:12-99(a)(13)
[3] N.J.S.A. 5:12-101(b)
[4] N.J.S.A. 5:12-70(g)
[5] N.J.A.C. 19:45-1.25(f). These provisions have since been redesignated as subparagraph (g) of § 1.25 of the regulation.
[6] "Casino clerk" is defined by N.J.A.C. 19:45-1.12 as "the person located at a desk in the pit to prepare, under the supervision and direction of the Cage Manager, documentation required for the operation of games including but not limited to, Requests for Fills, Requests for Credits and Counter Checks."
[7] N.J.A.C. 19:45-1.15(b).
[8] Final Report, Staff Policy Group on Casino Gambling, supra at 35.