222 N.J. Super. 464 (1988)
537 A.2d 704
IN THE MATTER OF THE PETITION OF ADAMAR OF NEW JERSEY, INC., REQUESTING A DECLARATORY RULING CONCERNING THE OFF-SITE ACCEPTANCE OF PAYMENTS ON NON-RETURNED COUNTER CHECKS, ETC.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1987.
Decided January 19, 1988.
*467 Before Judges J.H. COLEMAN, O'BRIEN and HAVEY.
Robert L. Hollingshead argued the cause on behalf of appellants (Pitney, Hardin, Kipp & Szuch, attorneys; Robert L. Hollingshead, Elizabeth J. Sher and James A. Schragger on the joint brief with Mark H. Sandson, attorney for appellant Adamar of New Jersey, Inc., Hankin, D'Amato & Sandson, attorneys; Brian D. Spector, attorney for appellants Trump Plaza Associates and Trump's Castle Associates, Ribis, McCluskey & Graham, attorneys; Kenneth F. Oettle, attorney for appellant GNOC, Corp., Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, attorneys).
Robert J. Gennat, General Counsel, argued the cause for respondent New Jersey Casino Control Commission (Robert J. Genatt of counsel and on the brief).
Kevin F. O'Toole, Deputy Attorney General, argued the cause for the respondent Division of Gaming Enforcement (W. Cary Edwards, Attorney General of New Jersey, attorney; Kevin F. O'Toole and Christopher Pitts, Deputy Attorney General, on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
In these consolidated appeals, five casino licensees[1] challenge the Casino Control Commission's (Commission) denial of the casinos' application to collect outstanding counter checks "in the field" or at branch offices. We now affirm.
In 1980, several casino licensees sought to implement passive collection activities for accepting payments from patrons on outstanding patron counter checks at casino branch offices located within and outside New Jersey. "Outstanding counter *468 checks," are patron gaming checks which have not yet been deposited in the bank for collection pursuant to N.J.S.A. 5:12-101(c). "Passive collection" is a procedure whereby a licensed casino employee is sent at the patron's request to a location other than the cashiers' cage for receipt of payment of a patron's gaming checks. The Commission notified the casino licensees that in order to implement branch office procedures for passive collection, the casinos would have to seek formal Commission approval. In response, the casinos submitted internal control procedures for branch office collection and were granted approvals, ratified by the Commission, on a case-by-case basis from 1983 to 1985. The casinos receiving approval were Atlantis, Sands, Golden Nugget, Resorts and Boardwalk.
In 1985, Adamar of New Jersey, Inc. (Adamar), doing business as the Tropicana Hotel and Casino, submitted procedures for "field" collections of outstanding counter checks at unspecified locations, including a patron's home or place of business. After the Division of Gaming Enforcement interposed an objection, Adamar petitioned the Commission seeking a declaratory ruling that off-site acceptance of payments on outstanding counter checks did not violate the Casino Control Act, N.J.S.A. 5:12-1, et seq., or its attendant regulations, N.J.A.C. 19:45-1.1, et seq. Under Adamar's proposed collection procedure, the patron would be given a receipt by the collecting employee but the original counter check would not be released from the cashiers' cage until the funds were received and accepted at the cage. It was stressed that the proposed collection activity would be instigated only on the initiative of the patron.
During the pre-hearing conferences, the present appellants intervened and joined Adamar's petition. After the hearing, the Commission denied the casinos' request to receive payments on outstanding counter checks either in the field or in branch offices. In denying the request, the Commission noted that under N.J.S.A. 5:12-101, the act's credit provision, there can be no "collection" on an outstanding counter check other than bank deposit for payment, except for redemption or consolidation *469 of the check by the patron, and that the statute permits collection efforts only on returned counter checks. "Returned counter checks" are checks which are issued by a patron to a casino for gaming credit and which have been returned by a depository bank unpaid for insufficient funds. See N.J.S.A. 5:12-101(e). The Commission also reviewed the comprehensive regulations pertaining to receipt of cash or cash equivalents and redemption of outstanding counter checks, and concluded that such receipt and redemption must occur within the well-monitored casino cashiers' cage. Also, while acknowledging that the Commission and Division staff had approved collection procedures at branch offices and that it had ratified these procedures, the Commission determined it was empowered to reopen and vacate the approvals to protect the public interest and integrity of the casino industry. Finally, it granted the casinos' request to collect returned counter checks both in the field and at branch offices.
Appellants contend that disapproval of off-site collection of counter checks was overbroad and incorrect as a matter of law because: (1) neither the act nor the regulations prohibit passive collection on outstanding counter checks in the field; (2) such collection does not constitute "redemption" in violation of the act or regulations; (3) the prior case law relied on by the Commission is inapposite and unpersuasive, and (4) there is no logical distinction between collection of returned counter checks and outstanding counter checks. Appellants also challenge the Commission's revocation of prior approvals to collect outstanding counter checks at branch offices as being unfair and unreasonable.
Generally, we are not bound by an agency's determination of a strictly legal issue. Fedders Financial Corp. v. Taxation Div. Dir., 96 N.J. 376, 392 (1984); Mayflower Securities Co. v. Bureau of Securities, 64 N.J. 85, 93 (1973). However, we accord substantial deference to an interpretation of a statute or regulation by the agency responsible for enforcing it. *470 Mortg. Bankers Ass'n v. N.J. Real Estate Com'n, 102 N.J. 176, 191 (1986); In re Appeal of Lembo, 151 N.J. Super. 242, 249 (App.Div. 1977). Further, we must defer to the administrative agency's expertise in relation to technical matters. Riverside General v. N.J. Hosp. Rate Setting Com'n., 98 N.J. 458, 469 (1985).
Moreover, statutes and regulations promulgated thereunder must be read so as to implement the legislative intent permitted by statute. Foreign Auto Prep. S. v. N.J. Economic D. Auth., 201 N.J. Super. 428, 433 (App.Div. 1985). In that regard, our Supreme Court has recognized "the strong state interest in promoting scrupulous conduct by the casino industry and regulatory officials." Greenberg v. Kimmelman, 99 N.J. 552, 560 (1985). Further, the Law Division in Playboy-Elsinore Assocs. v. Strauss, 189 N.J. Super. 185, 191 (Law Div. 1983), noted that "practices and procedures involved with the extension of credit by the casinos are among the most sensitive aspects of casino operations."
Prior to the passage of the act, there was strong resistance to allowing credit to patrons at all. See Report and Recommendations of Casino Gambling by the Commission of Investigation of the State of New Jersey (April 1977). The SCI was concerned with the potential for illegal diversion of funds and "strong arm" methods of debt collection. Id. at 2-E to 3-E. The particularized sections of the act governing credit obviously responded to this opposition and must be read as intending to accomplish several purposes: to provide for a traceable, efficient "paper trail" of credit transactions; to prevent "skimming," and to require prompt deposits of credit checks thereby allowing regulators to monitor the collection of debts. See Playboy Elsinore Assocs., supra, 189 N.J. Super. at 191-192.
Thus, the act's credit provision, N.J.S.A. 5:12-101, narrowly circumscribes the manner by which credit shall be offered to patrons. Section 101(c) provides for the time and manner by *471 which counter checks shall be deposited in the bank. The only exception to the check deposit obligation is redemption, partial redemption or consolidation by the patron. There is no provision for the collection of counter checks by casino personnel; "collection" activities are expressly limited to checks returned by banks without full or final payment. N.J.S.A. 5:12-101(e). Considering the legislative intent to carefully limit and control credit transactions, we agree with the Commission that it would be an abuse of the interpretative process to read section 101 as intending to allow collection of outstanding counter checks except as expressly provided therein.
We also agree with the Commission that the comprehensive attendant regulations require collection on outstanding counter checks to take place at the cashiers' cage. Appellants contend that N.J.A.C. 19:45-1.15(b)(1)(i) provides only that the duties of the cage personnel include receipt of payments for redemption but does not mandate receipt of payments at the cage. It notes the contrasting language under N.J.A.C. 19:45-1.25(e) which states that "[c]ash equivalents and casino checks ... shall only be accepted at the cashiers' cage by general cashiers" and argues that it was not the drafters' intent to restrict receipt of payments as they restricted acceptance of payment.
Appellants' argument ignores the overall regulatory scheme. The cashiers' cage has the responsibility for "the exchange, redemption and consolidation of patron checks received for the purposes of gaming," as well as of maintaining custody of patron checks, documents and records normally associated with the operation of the gaming cage. N.J.A.C. 19:45-1.11(c)(9)(i) and (ii). All consolidations, redemptions or substitutions of checks by gaming patrons shall be made at the general cashiers' cage. N.J.A.C. 19:45-1.26(d). Further, cashiers shall perform their functions within the physical confines of the cashiers' cage. N.J.A.C. 19:45-1.15. The cashier's function shall be, but not limited to, the following:

*472 i. Receive cash, cash equivalents, checks, gaming chips and plaques from patrons for check consolidations, total or partial redemptions or substitutions[.] [N.J.A.C. 19:45-1.15(b)(1)(i)].
The unmistakable thrust of these regulations is that the sensitive function of receiving cash or cash equivalents for the payment and redemption of outstanding counter checks is given exclusively to the cashier and must occur within the well-fortified and highly monitored confines of the cashiers' cage. The regulatory scheme recognizes the overriding need to provide security during cash transactions, to centralize the place for sensitive credit transactions and to facilitate monitoring by casino and Commission officials. Collection of outstanding counter checks at off-site locations does not carry with it these protections and thus runs counter to the spirit of the act and its attendant regulations.
Appellants next contend that while "redemption" must occur at the general cashiers' cage, see N.J.A.C. 19:45-1.26(d), receipt of payment by casino personnel at an off-site location does not constitute redemption. Citing N.J.A.C. 19:45-1.25(e), appellants argue that if payment is received in the form of a cash equivalent, "redemption" does not occur until the casino has accepted the cash equivalent and physically returned the counter check. If payment is received in cash, appellants claim that "redemption" occurs when the cashier voids the original counter check and returns it to the patron pursuant to N.J.A.C. 19:45-1.26(f). Under the procedure proposed by appellants, the patron would be given a receipt by the collecting employee, but the counter check would not be released until the funds were received at the cage.
This type of bifurcated transaction conflicts with the plain language of N.J.A.C. 19:45-1.15(b)(1)(i) which requires cashiers to receive cash or cash equivalents "from patrons ... for total or partial redemption." [Emphasis supplied]. Thus, receipt of cash or cash equivalents at the cashiers' cage must be from the patron, not from a casino employee who has collected the cash or cash equivalents in the field or some other location.
*473 Further, appellants' argument contradicts the evident statutory and regulatory intent to create a well-documented, traceable and efficient "paper trail" to allow internal casino control and efficient access by regulators to all information respecting credit transactions. See Playboy-Elsinore Assocs., supra, 189 N.J. Super. at 189-192. As the court in Playboy observed, "[i]t is clear that the thrust of the regulatory scheme is to require all credit transactions to be administered through the cashiers' cage...." Id. at 193. Finally, N.J.S.A. 5:12-101(c) allows redemption of a counter check "by exchanging cash or chips in an amount equal to the amount for which the check is drawn," and N.J.A.C. 19:45-1.26(a) provides that a counter check may be redeemed by "exchanging cash, cash equivalents, gaming chips" or any combination thereof. [Emphasis supplied]. As the Division persuasively argues, a sensible reading of both section 101(c) and the regulation requires a contemporaneous exchange of funds and surrender of the patron's counter check to effect a redemption. A bifurcated collection procedure may spawn litigation resulting from claims that the funds were lost or converted before they reached the cashiers' cage. The regulations governing receipt of funds and redemption transactions, N.J.A.C. 19:45-1.15(b) and 19:45-1.26, must be read together in order to ensure that the most sensitive part of the transaction, receipt of funds, occurs in the well-monitored cage.
For the foregoing reasons we are persuaded that the Commission's prohibition of the practice of collecting outstanding counter checks at locations other than the casino cashiers' cage is consistent with the act and the pertinent regulations.
As earlier noted, the Commission had given prior approval to five casinos to conduct branch office collection activities on outstanding counter checks. Appellants argue that the decision rescinding these approvals is neither fair nor reasonable and should be reversed. They claim that the issue of branch office collection was not properly before the board since Adamar's petition sought approval only for "in the field" collection. They *474 also contend that the Commission's decision exceeded its power to reopen matters previously resolved and that it should be estopped from rescinding the approvals.
Although Adamar's petition did not expressly raise a question as to the validity of branch office collection procedures, the following issue was expressly formulated during the first pre-hearing conference during which each of the appellants were invited to participate:
Were the staffs of the Commission and the Division correct in permitting the receipt of funds at off-site branch collection offices for the payment of returned counter checks, for the redemption of outstanding counter checks and for the receipt of funds for safe keeping deposits?
By formulating the issue at the hearing and giving appellants the opportunity to fully participate, the Commission acted reasonably in its decision to reconsider the prior approvals.
We are also satisfied that the Commission did not exceed its power in reopening the prior approvals. It is settled that an administrative body has the inherent power, in the absence of legislative restriction, to reopen or modify orders previously entered. Duvin v. State, 76 N.J. 203, 207 (1978). However, that power must be exercised reasonably and invoked only for good cause shown, and only where the applicant acted with reasonable diligence. Id; see also Burl. Cty. Evergreen Pk. Mental Hosp. v. Cooper, 56 N.J. 579, 600 (1970). Moreover, an administrative agency has continuing regulatory responsibilities over areas within its jurisdiction, and it is therefore fitting, subject to statutory restrictions, that the agency be empowered to reconsider its actions in order to carry out its regulatory powers. In re Trantino Parole Application, 89 N.J. 347, 364 (1982); Ruvoldt v. Nolan, 63 N.J. 171, 183 (1973). Here, there was "good cause" to correct the prior approvals in order to bring collection practices within the intendment of the regulations and to provide optimum security and control during credit transactions.
Finally, there is no showing of detrimental reliance on the prior approvals, or a "manifest wrong and injustice" sufficient *475 to invoke the doctrine of equitable estoppel against this governmental entity. Vogt v. Borough of Belmar, 14 N.J. 195, 205 (1954); see also O'Malley v. Depart. of Energy and Depart. of Civil Service, 109 N.J. 309 at 316 (1987) (slip opinion at 10). Courts rarely invoke equitable estoppel against a governmental entity, particularly where estoppel interferes with essential governmental functions. Ibid. To the extent that the staffs of the Commission and Division, and the Commission in ratifying their actions, erred in permitting payment on outstanding counter checks at branch offices, the Commission properly exercised its authority to reopen and vacate the approvals.
The decision of the Commission is affirmed.
NOTES
[1] The five appellant Atlantic City casino licensees are Boardwalk Regency Corporation, Adamar of New Jersey, Inc., Trump Plaza Associates, Trump's Castle Associates and GNOC, Corp.