**GNOC, CORP. t/a Golden Nugget Hotel & Casino, Plaintiff,**

v.

**Cecilia ENDICO, Executrix of the Estate of Leon Endico, Sr., Deceased, Defendant.**

**No. 87 Civ. 7456–CLB.**

United States District Court, S.D. New York.

June 28, 1988.

As Corrected Sept. 2, 1988.

**1516**

Thomas Hendrickson, Greenberg, Margolis, Ziegler, Schwartz, Dratch & Fishman, P.A., Roseland, N.J., for plaintiff.

Joseph P. Governali, White Plains, N.Y. (Roger Milch, of counsel), for defendant.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

By motions fully submitted on March 26, 1988 in this diversity action relating to certain checks issued by the deceased Leon Endico, (1) defendant Cecilia Endico, daughter-in-law and executrix of his estate, moves under Rule 12(b)6, Fed.R.Civ.P. for dismissal of the complaint for failure to state a claim upon which relief can be granted or, alternatively, for summary judgment under Rule 56, Fed.R.Civ.P., and (2) plaintiff G.N.O.C. Corp., t/a Golden Nugget Hotel & Casino ("GNOC" or "the Casino") also moves for summary judgment. The summary judgment motion of defendant Mrs. Endico is granted and plaintiff's motion is denied, for the reasons set forth below.

The following factual account, derived from the submissions of both parties read in the light most favorable to plaintiff, is accepted for current purposes. *Eastway Const. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

On April 20, 1985, Mr. Endico, a resident of Peekskill, New York, signed 10 checks, totalling $50,000, at plaintiff's gambling casino in Atlantic City, New Jersey, where he was a regular patron. On May 4, 1985, Mr. Endico died, before the markers, which were deposited in a New Jersey bank on May 8 (*see,* exh. B to defendant's January 15, 1988 notice of motion and affidavit of counsel), were presented for payment at his bank in Westchester County, New York. The Casino received notice of dishonor from Mr. Endico's bank on May 17, by the traditional rubber stamp "N.S.F.", which stands for "not sufficient funds". By letter dated June 20, 1985 the Casino expressed its "sincere condolences" to Mrs. Leon Endico for her husband's death, and informed her of the $50,000 outstanding claim against his estate. In October of 1987, plaintiff commenced this action to recover on the checks.

Defendant moved to dismiss for failure to state a claim; plaintiff responded with a summary judgment motion, and, after further submissions, defendant asked that her motion be considered alternatively as for summary judgment. In view of the submissions made, and consistent with the understanding of the parties, the Court will treat both parties' motions as seeking summary judgment. *See, In re G. & A. Books, Inc.,* 770 F.2d 288 (2d Cir.1985), *cert. denied sub nom., M.J.M. Exhibitors, Inc. v. Stern,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

*Discussion*

A federal court sitting in diversity must apply the substantive law of the state in which it sits, *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including that state's choice of law provisions, *Klaxon v. Stentor,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In areas not of particular federal concern, public policy determinations of the forum state also should be adopted. *See,* 1A–Pt. 2 *Moore's Federal Practice* ¶ 0.311[1] (collecting cases).

New York State holds gambling debts contracted within its borders unenforceable as contrary to public policy. *See,* N.Y. *General Obligations Law* § 5–401 (McKinney's & supp.); *Ruckman v. Pitcher,* 1 N.Y. 392 (1848). While New York Courts have noted a trend away from moral pronouncements on authorized gambling, *see, e.g., Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964), the decision to prohibit any activity in a free society necessarily

relies, at least in part, on the judgment that it constitutes a social evil. In taking this view, New York adds its voice to those of countless religious leaders, politicians, philosophers and social commentators, among others, who have criticized this ancient and seemingly instinctive human vice. *See, e.g., The Code of Manu,* IX c. 100 ("let the king prohibit gambling and betting in his kingdom, for these are vices that destroy the kingdoms of princes"); Thomas Jefferson ("Gaming corrupts our dispositions, and teaches us a habit of hostility against all mankind"), *quoted in,* S. Longstreet *Win or Lose* 30; George Bernard Shaw ("the roulette table pays nobody except him who keeps it"), *Maxims for Revolutionists.* New York bends its moral code slightly in circumstances where gambling also improves the breed of horses, *see, New York Racing, Pari–Mutuel Wagering and Breeding Law* §§ 201–435 (McKinney's & supp.), or defrays critical needs of local government, *see, McKinney's New York State Const.* Art. 1, § 9 (authorizing state and local governments to run lotteries).

Also, under New York law, gambling debts are enforceable if validly entered into and enforceable where contracted. *Intercontinental Hotels Corp. v. Golden, supra; National Recovery Systems v. Mazzei,* 123 Misc.2d 780, 475 N.Y.S.2d 208 (Sup. Ct.Sflk.Cty.1984). Therefore, the issue on these motions is whether Mr. Endico's debt to the Casino would be enforced by the courts of New Jersey.

As a general rule, New Jersey has agreed with the New York policy view toward gambling, and its courts will not assist in the collection of most gambling debts. *Playboy–Elsinore Assoc. v. Strauss,* 189 N.J.Super. 185, 459 A.2d 701 (A.D.1983); *see also, Caribe Hilton Hotel v. Toland,* 63 N.J. 301, 307, 307 A.2d 85 (1973) (reviewing the history of New Jersey gambling statutes, and concluding, "our policy has become one of carefully regulating certain permitted forms of gambling while prohibiting all others entirely").

However, with the advent of licensed casino gambling in New Jersey, the state legislature apparently decided that the public interest would not be served by limiting Casino operators solely to the extra-legal collection devices traditionally associated with gambling debts. Beyond its desire to prevent breaches of the peace and to protect the kneecaps of recalcitrant debtors, *see, e.g., In re Adamar,* 222 N.J.Super. 464, 537 A.2d 704 (A.D.1988) (expressing concern about " 'strong arm' collection tactics" possibly being employed by casinos), the legislature, as an unseen but ever-present partner of the professional gambler, has a financial motive for allowing the extension of unsecured credit by gaming houses to their patrons. The ability legally to provide this service makes the casinos more profitable; after all, who needs credit from the casino when they are winning? An increase in casino profits means increased revenues for the state which, in its constant quest to secure the greatest good for the greatest number, often resorts to the proceeds of conduct which it considers morally ambiguous, or worse. *See,* New York *Tax Law* §§ 611, 612 (McKinney's) (substantially adopting federal tax code's definition of "gross income" for purposes of taxation); *see also, U.S. v. Abodeely,* 801 F.2d 1020 (8th Cir.1986), *and, U.S. v. Tunnell,* 481 F.2d 149 (5th Cir.1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563, *reh. denied,* 416 U.S. 963, 94 S.Ct. 1983, 40 L.Ed.2d 314 (1974) (proceeds of prostitution are taxable); *Solomon v. C.I.R.,* 732 F.2d 1459 (6th Cir.1984) (proceeds of embezzlement are taxable); *U.S. v. Hilton,* 534 F.2d 556 (3d Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976) (kickbacks are taxable); *U.S. v. Moran,* 236 F.2d 361 (2d Cir.), *cert. denied,* 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956) (extortion payments taxable); *Winkler v. U.S.,* 230 F.2d 766 (1st Cir.1956) (proceeds of bookmaking taxable); *Humphreys v. C.I.R.,* 125 F.2d 340 (7th Cir.), *cert. denied,* 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513 (1942) (ransom receipts taxable).

The New Jersey legislature therefore created a narrow exception in the Casino Control Act, N.J.S.A. § 5:12–101, which allows the collection of New Jersey gambling debts manifested by checks that comply with the relevant statutory and regulatory

requirements. N.J.S.A. § 5:12–101(f) reads:

"Notwithstanding the provisions of any law to the contrary, checks cashed in conformity with the requirements of this act shall be valid instruments, enforceable at law in the courts of this State. Any check cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable."

Section 5:12–101(b), which modifies subdivision (f), requires that "the regulations concerning check cashing procedures [be] observed by the casino licensee and its employees and agents".

Case law has established that substantial compliance with the provisions of state laws and regulations will not satisfy N.J. S.A. 5:12–101; only punctilious observance will allow a casino to collect on credit extended through the acceptance of checks. *See, Resorts Int'l Hotel, Inc. v. Salomone,* 178 N.J.Super. 598, 607, 429 A.2d 1078 (A.D.1981) ("Casinos must comply with the legislature's strict control of credit for gambling purposes. Unless they do so, the debts reflected by players' checks will not be enforced in our courts") (declining to enforce debt manifested by checks not timely deposited, and not dated, as required by 5:12–101). *See also, Nemtin v. Zarin,* 577 F.Supp. 1135, 1146 (D.N.J.1983) ("[nothing] less than strict compliance [with state regulatory requirements] will do for claims arising out of gambling activities within New Jersey").

The first of plaintiff's two claims is based not on the checks issued by Mr. Endico, but on the underlying debt. That claim therefore is not within the narrow statutory exception of § 5:12–101, and defendant's motion on this count hereby is granted. *See, Resorts Int'l Hotel, Inc., supra,* 178 N.J.Super. at 606, 429 A.2d 1078.

Defendant urges dismissal of the second claim, arguing that the instruments at issue were accepted in violation of various provisions of state law. Plaintiff insists it complied with all relevant standards. Of particular significance is Mrs. Endico's allegation, disputed by the casino, that GNOC failed to place a restrictive endorsement " 'for deposit only' to the casino licensee's bank account" on the back of the subject checks, as required by N.J.A.C. § 19:45–1.25(k).

The checks bear an indorsement stamp that reads merely, "For deposit only, GNOC Corp.", and beneath the indorsement, amid an array of markings from other holders, a separate stamp has imposed an eight-digit number, which we accept for current purposes as plaintiff's account number at an unspecified bank. *See,* exhibit B to defendant's January 15, 1988 notice of motion and affidavit of counsel. Resolution of the parties' motions turns on whether or not, as a matter of law, such an indorsement is "to the casino licensee's bank account" within the meaning of N.J. A.C. § 19:45–1.25(k).

No governing case law on this point has been cited to or discovered by the Court. We conclude that the courts of New Jersey would not enforce this debt, because of that state's powerful public policy concerns that require full, strict and literal compliance with all statutory and regulatory requirements in the collection of gambling debts. *See, Greenberg v. Kimmelman,* 99 N.J. 552, 560, 494 A.2d 294 (1985) (recognizing "the strong state interest in promoting scrupulous conduct by the casino industry"). These concerns are particularly implicated when a casino extends credit to a patron. *See, e.g., In re Adamar, supra,* 222 N.J.Super. 464, 537 A.2d 704) (casino regulatory statutes "must be read as intending to ... provide for a traceable, efficient 'paper trail' of credit transactions"); *Resorts Int'l, supra,* 178 N.J.Super. at 603, 606, 429 A.2d 1078 ("ready, unlimited credit can have a 'pernicious effect' upon the compulsive or imprudent player"), *quoting, New Jersey Governor's Staff Policy Group on Casino Gambling, 2d Interim Report* 34–35 (1977).

The checks in this case do not contain the restrictive endorsement "for deposit only" to the licensee's account in a specific, clearly identified bank. Furthermore, for reasons not explained, they were apparently held by the casino and not deposited during

the life of the maker. As between the professional gamblers who operate out-of-state casinos, and their customers, the statutes should be read favorably to the latter.

The clerk shall enter final judgment.

SO ORDERED.