800 A.2d 279

MELVIN HARTMAN, ELWOOD G. LAWTON AND JOSEPH LEO-
NARDIS, PETITIONERS–APPELLANTS, v. NEW JERSEY RAC-
ING COMMISSION, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 28, 2002—Decided July 2, 2002.

Before Judges PETRELLA, KESTIN and ALLEY.

*Timothy M. Donohue* argued the cause for appellants (*Arleo & Donohue*, attorneys; *Mr. Donohue* and *Dawn M. Donohue* on the brief).

*David A. Brooks*, Deputy Attorney General, argued the cause for respondent *New Jersey Racing Commission* (*David Samson*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Mr. Brooks*, on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

Three owners of race horses appeal from a final determination of the New Jersey Racing Commission requiring them to return purse monies won by their horses that were under the supervision of a trainer who, unknown to them during that time, was under a

suspension in New York State and, thus, held to be ineligible to participate in the races in New Jersey.

The New Jersey Racing Commission (Commission) on March 22, 2001, required the owners of the affected horses, Leonardis, Lawton, and Hartman (owners) to return purse monies won by their horses and trained by William Robinson in races between March 1 and March 15, 1999,[1] the period when Robinson was serving a fifteen-day suspension imposed on him in a Notice of Suspension[2] dated February 22, 1999, effective March 1, 1999, by the New York State Race and Wagering Board after one of the horses he trained tested positive for the illegal chemical, Lidocaine.

After being made aware of the trainer's suspension, a State Steward, Richard O'Donnell (steward), conducted a hearing that resulted in a May 8, 1999 decision imposing a thirty-day suspension and a $500 fine on Robinson. This ruling further provided:

In addition the horses that raced in New Jersey during the period of suspension are declared ineligible to have participated and as such all purse monies earned by these horses are to be returned and the trainers fee also returned. Suspension will not be terminated until all moneys are returned.

Only the impact on the three affected horse owners is implicated in this appeal. It is not disputed that neither the Commission nor the horse owners were aware of Robinson's suspension at the time of the 1999 harness races. They were informed of the steward's decision by letters dated November 11 and November 12, 1999, advising them that they were required to return their winnings. They appealed this determination to the Commission and the dispute was referred to the Office of Administrative Law as a contested case. The matters were consolidated and the parties'

---

[1] Hartman's horse, Homespun Fun, won $15,750 in a race on March 12, 1999; Lawton's horse, Southview Matt, had a combined winning of $12,510 from races on March 3, 1999 and March 13, 1999; and Leonardis' horse, Jays Table, won $7,425 on March 5, 1999 at the Meadowlands Racetrack in East Rutherford.

[2] The Notice of Suspension indicates that it was sent to Robinson's address in Ontario, Canada. It also imposed a $250 fine.

motion for summary decision was heard on October 30, 2000 by an Administrative Law Judge (ALJ).

The steward indicated in an October 17, 2000 certification submitted to the ALJ that he did not receive notice of Robinson's "suspension until after March 13, 1999, the last day that the horses in issue raced," and that he did not receive a copy of the Notice of Suspension, dated February 22, from New York until March 25, 1999. O'Donnell further certified that:

All rulings affecting trainers in every jurisdiction are sent to the United States Trotting Association (USTA) in Columbus, Ohio. Once a week a penalty record is printed and forwarded to the various state racing associations. New Jersey neither controls nor dictates the method by which another state transmits its notices to the USTA.

Interestingly, *N.J.S.A.* 5:5–30 provides "that all harness races shall be subject to the reasonable rules and regulations from time to time prescribed by the [USTA] organized under the laws of the State of Ohio." This statute goes on to provide that the Commission may modify or abrogate a rule or regulation of the USTA after giving it "an opportunity to be heard." New Jersey's implementing regulations declare that where there is a conflict between the Commission's rules and those of the USTA, "the rules of the Commission shall govern." *N.J.A.C.* 13:71–1.1(b).

The ALJ rendered an "initial decision" in favor of the owners. He found that although Robinson was in violation of state regulations,[3] *N.J.A.C.* 13:71–1.10 does not contemplate strict liability of an owner for such conduct. The ALJ further stated that although there are circumstances where owners are the "absolute insurers" of their horses, fundamental fairness requires knowledge of wrongdoing in this instance. Because he concluded that the owners acted in good faith, the ALJ determined that they should not be required to return their winnings.

In its final decision, dated March 22, 2001, the Commission adopted the ALJ's findings of fact, but disagreed with and re-

---

[3] Although Robinson's supervision was imposed by another jurisdiction, under *N.J.A.C.* 13:71–1.10 it is given "Full force and effect" by New Jersey.

versed his legal conclusions and ordered the owners to return all purse monies they won from the disputed races. The Commission reasoned:

> Although this result, at first glance, may seem fundamentally unfair to the petitioners, the Commission must uphold and enforce the rules of racing. In weighing the equities of this case and deciding who should benefit under the facts of this case, it is clear that the purses can only be paid to the owners and trainers of those horses who were properly entered.

The Commission concluded that strict liability attached in this instance, stating:

> In choosing a trainer for his or her race horse, the owner bears the risk and must accept the loss when the person employed fails to comply with the Racing Commission's regulations. Absentee owners, simply by virtue of being absent, are not exempted from ensuring that those who are charged with the care, custody and racing of their horses are properly licensed and acts [*sic*] consistently with the rules of racing.

The Commission's final decision stated: "it is clear that the purses can only be paid to the owners and trainers of those horses who were properly entered." The remedy of forfeiture of purse awards when a rule has been violated is provided for in *N.J.A.C.* 13:71–2.3(a)(5). Finally, the Commission felt that the harshness of its ruling could be mitigated by the owners taking action against the trainer. The owners appealed the Commission's decision.

In this case, it is undisputed that trainer Robinson violated *N.J.A.C.* 13:71–1.16 and *N.J.A.C.* 13:71–1.17 by participating as a trainer in the disputed harness races while his license was suspended in another jurisdiction. However, the owners argue that the Commission's decision ordering them to return the purse monies was "unconstitutional, fundamentally unfair and contrary to the regulations governing the authority of the Commission." They contend that fundamental fairness requires that the owners of race horses must possess knowledge of their trainers' ineligibility at the time of the race before they can be ordered to forfeit purse monies. Moreover, they assert that New Jersey law does not impose strict liability when an owner unknowingly employs a suspended trainer, and the failure of the State to promulgate a regulation or statute imposing strict liability in such cases pre-

cludes it from taking such action because doing so would violate due process.

While *N.J.A.C.* 13:71–2.3(a)(5) provides that forfeiture of purse winnings is an appropriate sanction for a violation of the law or the rules of the Commission, the regulations are silent on whether that sanction automatically attaches to owners of horses who unknowingly employ a trainer who violated the regulations.

Because racing is accompanied by legalized gambling it "strongly impact[s] the public interest." *DeVitis v. New Jersey Racing Commission,* 202 *N.J.Super.* 484, 490, 495 *A.2d* 457 (App.Div.), *certif. denied,* 102 *N.J.* 337, 508 *A.2d* 213 (1985). In *Moiseyev v. New Jersey Racing Commission,* 239 *N.J.Super.* 1, 7, 570 *A.2d* 988 (App.Div.1989), we said:

> We have upheld the strict and close regulation of the racing industry; we recognize and give deference to the Racing Commission's expertise. ... We understand that the overriding goal in the regulations is to insure the public's confidence in the integrity of horse racing.

However, we also cautioned that the Commission does not have "unfettered discretion to impose any penalty." *Id.* at 12, 570 *A.2d* 988 [citation omitted].

The Commission's regulations in some cases have the effect of imposing strict liability on horse owners. For example, *N.J.A.C.* 13:71–23.7(b) provides that an owner whose horse has been found after a race to have "any drug or substance foreign to the natural horse in its body" forfeits purse money. In *Dare v. State,* 159 *N.J.Super.* 533, 388 *A.2d* 984 (App.Div.1978), we upheld the Commission's authority to impose such penalties when a horse was administered an illegal drug. We concluded that the Legislature vested the Commission with broad powers "necessary or proper" to carry out the purposes of the act under *N.J.S.A.* 5:5–22, and that the imposition of such penalties in a drug or foreign substance case was not a deprivation of due process.

The owners assert, however, that unlike the situation where drugs are involved in a harness race, the trainer's misdeed in this

instance "did not adversely affect the result of the races in question" and thus, strict liability is inappropriate. The owners also argue that because it is the Commission's responsibility "to monitor and enforce its reciprocity rules," an innocent owner cannot be held liable for its failure to do so. They claim that because the Commission failed to timely disqualify Robinson for his rule violation, it is now estopped from declaring him unqualified. The Commission took the view that, here, the results of the races were adversely affected in that the horses of the three owners should not have been in the races in the first place (at least with a suspended trainer).

At the outset, we note that the present case does not involve an estoppel situation as presented in *Bunny Stables v. New Jersey Racing Commission,* 3 *N.J.A.R.* 148 (1981). Rather, the issue revolves around notice and due process under the regulatory framework. For instance, *Bunny Stables* involved an ALJ's determination that the failure by the Standardbred Breeders and Owners Association of New Jersey (SBOA) to protest a horse's eligibly before a race, as required by *N.J.A.C.* 13:71–4.1, estopped a state steward from later contesting the horse's eligibility. That case involved a scenario where the SBOA knew of the horse's potential ineligibility prior to the race and had ample opportunity to file a protest; but did not do so. The SBOA's failure to file a protest, even though it knew of the horse's alleged ineligibility, formed the basis for the estoppel. *Id.* at 154. In *Bunny Stables,* the disputed horse had met all of the necessary qualifications and was eligible to race. *Id.* at 155–156. Such a situation does not exist here.

Ordinarily, an agency's interpretation of its own regulations is entitled to substantial deference. *Petition of Adamar of New Jersey,* 222 *N.J.Super.* 464, 469–470, 537 *A.2d* 704 (App.Div.1988). While such an interpretation could lead to the conclusion that the entry of these horses with Robinson as their trainer while on suspension in effect altered the race and subsequent purse dis-

bursements,[4] we do not agree that such reasoning carries the day here, especially when there was no other illegality shown or any improper impact on the performance of these horses such as would affect the public interest. Although in certain instances, such as the presence of drugs or foreign substances in the horse, see N.J.A.C. 13:71–23.6, knowledge by the owner of a wrongdoing by a trainer or anyone else may be irrelevant, those instances are distinguishable from a situation where only the wrongdoer has present knowledge of his own out-of-state suspension and there is scant opportunity for the owner to obtain such knowledge.

The Commission does have the power to impose strict liability on owners if a statute or regulation provides for it. However, here there was no such statute or regulation imposing strict liability. Moreover, there is no showing in the record that the owners knew or should have known of Robinson's suspension in the relatively brief time between when the Notice of Suspension was mailed and delivered and its effective date.

Presumably, the Commission's agents are keenly interested in recovering such information promptly. However, in this case, even the steward did not learn of that suspension until after March 13, 1999. Thus, much of the fault lies in the procedures used by the USTA and the State agencies which fail to provide an effective mechanism to implement the purpose of the regulation giving "full force and effect" to out-of-state suspensions by failing to make such information available in an accessible form and timely manner.

The steward was not made aware of Robinson's fifteen-day suspension until some unspecifically stated time [5] after the March 13, 1999 race, and did not receive a copy of the notice until March

---

[4] The wagers of pari-mutual players and the payoffs were not affected because the disqualifications came after the respective racing dates.

[5] The certification is unfortunately vague as to the date notice was received. We trust it was not deliberately vague. Candor with the court requires accuracy and as much precision as possible.

25, 1999, some twelve days after the last disputed race. It was only after the written notice was received that the Commission took action. Here, the time frame virtually precluded opportunity for knowledge. We emphasize that there is no indication in the record as to the actual date of mailing of the New York agency's notice to Robinson in Ontario. Nor is there anything in the record to establish when Robinson received it or had notice of it.

Clearly, if a notice was mailed on February 22 or February 23, it would not have reached Robinson in the ordinary course for another day or so. Moreover, the steward's certification indicates that such notices are sent to the USTA by the various state licensing agencies, and the USTA compiles them once a week and then forwards all penalties to the various states. However, even if notice had been forwarded to the USTA at the same time that it was sent to Robinson, a lag of as much as a week might exist between then and when it was mailed to the various state racing authorities.

Although we are of the view that under certain circumstances an owner could forfeit a purse for allowing a trainer who is suspended in another jurisdiction to run a horse in a race in this State, we are satisfied under the circumstances of this case that basic principles of procedural due process and fundamental fairness militate against the imposition of such a sanction against these owners. Even the Commission in its decision recognized the apparent fundamental unfairness of its decision, but suggested the remedy of the owners is against the trainer—which might prove an empty gesture.

In the circumstances, and in light of the steward's certification that he did not receive notice until some unspecified time after the March 13, 1999 race, and did not receive a hard copy of the notice until March 25, there is nothing in the record to establish that the owners in this case could, or should, have obtained knowledge, actual or constructive, of the New York suspension of Robinson before the various races involved in this appeal from anyone

except Robinson (assuming he received the suspension notice that was apparently sent to Ontario) who was, in effect, the wrongdoer.

Although it was represented at oral argument that the USTA now posts information of this nature on its website, the record is silent as to the use and availability of the website in 1999.[6] If indeed there was a more rapid method in 1999 to determine trainer eligibility than the weekly mailings by the USTA alluded to in the steward's certification, that type of information must be shown to have been readily accessible to the owners and other interested parties before they may be charged with notice thereof.

Under the procedures noted in the record, a suspension that takes effect within the relatively short time frame of seven to eight days after the decision, and which is communicated or delivered within an even shorter time, hardly can serve as sufficient notice or provide sufficient administrative due process to support penalties on an owner for failing to be aware of the status of his trainer in other jurisdictions.

Simply put, it is not sufficient to say that the owner must rely on a trainer to keep his or her employer advised of suspensions. If there were ready means of verifiable access to accurate information about suspensions, then it might be fair and permissible to hold an owner liable for not checking the status of a trainer. However, the record reflects the finding that in this case the owners were all unaware of the status of trainer Robinson at the time of the respective races. More recent advances in technology may have made possible much speedier methods of communication between the USTA, the various state racing authorities and participants in the racing business. These include the increased

---

[6] We are aware that USTA maintains a website at *www.ustrotting.com,* but we discovered no listing there, or any obvious link to information about the status of suspended trainers or others. If such a link or website was, or is now, available the record does not indicate that fact and lacks sufficient basis to charge the owners with a duty to continuously "surf the web" and explore the Internet for every state in the Union. Of course, if properly listed, such information would also be available to the steward.

reliance on, and use of, the Internet, e-mail, fax machines and other electronic technology devices. However, before strict liability could be imposed in such a situation, owners have to be put on notice of where and how they can obtain such information quickly and accurately, especially when they are charged with the knowledge even before the New Jersey racing authorities had it. Such information is totally lacking in the record of this case, particularly where the matter was summarily decided.

We recognize that "full force and effect" is given by New Jersey to a revocation or suspension of a license by any other racing commission or turf governing body under *N.J.A.C.* 13:71–1.10. Thus, we agree that Robinson's suspension in New York would result in his being barred from participation at tracks in New Jersey. However, nothing in *N.J.A.C.* 13:71–1.10 makes clear or requires that the suspension shall occur at the exact same time as another state's suspension, particularly when New Jersey racing authorities and the Commission may not even have been aware of the suspension, until, as here, after the entire fifteen days suspension would have run, and subject to any other conditions of the penalty. Even a judgment of a sister-state, while entitled to "full faith and credit" under the United States Constitution, does not automatically get such status immediately. For example, the Uniform Enforcement of Foreign Judgments Act, *N.J.S.A.* 2A:49A–25 *et seq.*, requires that a foreign judgment must be filed with the Clerk of the Superior Court before its enforcement, or as an alternative, that an action to enforce the judgment can be brought. *N.J.S.A.* 2A:49A–31. *See also Philadelphia v. Wheeler,* 192 *N.J.Super.* 616, 471 *A.*2d 821 (Law Div.1983) (party must bring action to enforce foreign judgment in order for it to be given effect under the full faith and credit clause).

Reversed.