593 A.2d 1237

ADAMAR OF NEW JERSEY, INC. D/B/A TROPICANA HOTEL/CA-
SINO AND JOHN M. GALLAWAY, APPELLANTS, v. STATE OF
NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY,
DIVISION OF GAMING ENFORCEMENT, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 30, 1991—Decided August 2, 1991.

276

Before Judges KING, R.S. COHEN and STERN.

*Joel H. Sterns* argued the cause for appellant (*Hannoch Weisman*, attorneys; *Mark D. Schorr*, of counsel; *Mark D. Schorr, Scott A. Carver* and *Marshall D. Bilder*, on the brief).

*Denis J. Dooley*, II, Deputy Attorney General, argued the cause for respondent (*John A. Sweeney*, Assistant Attorney General, of counsel; *Denis J. Dooley* and *Gary A. Ehrlich*, Deputy Attorney General, on the brief).

*Dennis Daly*, Senior Assistant Counsel, argued the cause for the Casino Control Commission (*Daniel Carluccio*, General Counsel, attorney).

The opinion of the court was delivered by

STERN, J.A.D.

Adamar of New Jersey, Inc. doing business as the Tropicana Hotel/Casino (Tropicana), a licensed New Jersey Casino, and John M. Gallaway (Gallaway), President of Tropicana, appeal from a decision of the Casino Control Commission (Commission) which concluded that they violated provisions of the Casino Control Act (Act) and various regulations promulgated thereunder. They also appeal from the penalties imposed. Gallaway had been assessed a $10,000 penalty. Tropicana had had its

ability to extend credit to casino patrons suspended for two days,[1] and a $500,000 bad debt "write off" it took from the Casino Revenue Fund was also disallowed.

Before us, appellants contend that the Commission violated their due process rights by finding them to have violated regulations not formally charged in the complaint, that the adjudication was based on policy determinations not embodied in the regulations, that Tropicana's "credit determinations" and "collection efforts" "were reasonable" and that the Commission's contrary conclusion was not justified.

In its Amended Complaint, the Division of Gaming Enforcement (Division) charged appellants and Robert James, a Tropicana Vice President, with: 1) violation of *N.J.A.C.* 19:45–1.27(a) by Tropicana "by extending credit without adequate supporting information in the patron's credit file to justify said extensions of credit" for the period of March 25, 1986 through May 24, 1986; 2) violation of *N.J.A.C.* 19:45–1.29(e), *N.J.A.C.* 19:45–1.27(j) and *N.J.A.C.* 19:45–1.29(b) by Tropicana "by sending all statements, including those sent upon initial receipt of returned checks and those sent on a quarterly basis, to ... James and not to Edward Rood", a patron; "by failing to report to CCLV, the Casino Credit Bureau used by New Jersey casinos at that time, on a daily basis ... regarding any and all of the 24 returned counter checks drawn by patron Rood totaling $1,225,-000 [and] ... through its use of ... James in making contacts with patron Rood in efforts to collect the $1,225,000 debt owed by patron Rood to ... Tropicana despite the fact that ... James was not a member of the Collection Department" and violation of *N.J.A.C.* 19:45–1.29(b) by James, "in that even though he was not a member of the Collection Department he made contacts with Patron Rood in efforts to collect the $1,225,000

---

[1]No stay was entered, and this sanction has been satisfied. A $5,000 penalty was also imposed against Adamar's vice president Robert James, but that penalty is not the subject of this appeal. James settled the matter against him after resigning his position, leaving New Jersey and letting his license lapse. He is not a party to this appeal.

debt owed by Patron Rood to ... Tropicana"; 3) violation of *N.J.A.C.* 19:45–1.29(j) by Tropicana and Gallaway "in their failure to pursue reasonable collection efforts; their acceptance of a settlement not supported by the facts involved; and their failure to document properly their efforts to consider patron Rood's returned checks as uncollectible prior to writing off a portion of the debt due and owing"; 4) violation of *N.J.A.C.* 19:45–1.27(a) by Tropicana and Gallaway "by extending credit without adequate supporting information in the patron's credit file to justify said extension of credit" on May 29, 1987; 5) violation of *N.J.A.C.* 19:45–1.27(a) by Tropicana "by extending credit without adequate supporting information in the patron's credit file to justify said extension of credit" for the period May 29, 1987 to May 13, 1988; 6) violation of *N.J.S.A.* 5:12–101a(2) and *N.J.A.C.* 19:45–1.25(a)(2) by Tropicana and Gallaway "by releasing or discharging $500,000 in casino credit of patron Edward Rood on or about May 29, 1987, without a determination that said debt was uncollectible and without maintaining a written record of required collection efforts in accordance with the rules of the Commission;" and 7) violation of *N.J.S.A.* 5:12–102m(4) by Tropicana "by its failure to include an adequate reason, including player rating information, within the supporting documentation required to be maintained ... regarding noncash complimentary gifts in excess of $2,000.00."

A contested hearing was conducted before an Administrative Law Judge (A.L.J.) who recommended dismissal of all charges except those embodied in count two.

The A.L.J. found that Tropicana violated *N.J.A.C.* 19:45–1.27(j) by failing to advise Central Credit of Las Vegas (CCLV) about Rood's returned checks although obligated to report derogatory information on a daily basis. He found that other casinos were not hurt by Tropicana's inaction only because "Rood's credit was already suspended elsewhere", and that "Tropicana personnel followed a pattern of withholding derogatory information from CCLV about Patron Rood." He recommended a $25,000 penalty against Tropicana for this violation.

The A.L.J. also found that Tropicana and James violated *N.J.A.C.* 19:45–1.29(b) and (e). As *N.J.A.C.* 19:45–1.29(e) requires that "collection statements must be sent to patrons by persons in the collection department without incompatible functions," the A.L.J. found that Tropicana and James acted wrongfully in using James as a "middleman or conduit," despite his being "involved in credit issuing decisions and [the fact that] his position clearly forbade collections." For this "failure to utilize routine collection measures after Patron Rood's checks began returning, and the use of ... James to help collect the debt," the A.L.J. recommended "a penalty of $10,000 against Tropicana, and of $2,000 against Mr. James."

The Commission adopted the A.L.J.'s decision, subject to the modifications embodied in its July 25, 1990 Order. In the Commission's own words (as embodied in its brief before us summarizing its November 9, 1990 twenty-one page statement pursuant to *R.* 2:5–1(b)),[2] it found that:

(1) Adamar violated *N.J.A.C.* 19:45–1.27(a) on each of the occasions between March 25, 1986, and May 24, 1986, that it increased the credit limit of patron Edward Rood absent adequate supporting information to substantiate the change [Count I];

(2) Adamar and Robert James, a former vice president of casino operations, performed incompatible functions by allowing James to engage in collection efforts concerning Rood's outstanding debt in violation of *N.J.A.C.* 19:45–1.29(b) [Count II];

(3) Adamar sent collection statements to James instead of Rood in violation of *N.J.A.C.* 19:45–1.29(e) [Count II];

(4) Adamar failed to report derogatory information about Rood's credit to a casino credit bureau in violation of *N.J.A.C.* 19:45–1.27(j) [Count II];

(5) The failure of Adamar and Gallaway to pursue reasonable collection efforts required by *N.J.A.C.* 19:45–1.29(j) resulted [in] an improper write-off of Rood's uncollectible debts [Count III];

(6) Adamar and Gallaway reinstated Rood's credit without adequate supporting information contrary to *N.J.A.C.* 19:45–1.27(a) [Counts IV and V];

---

[2]This statement, entitled "Commission Decision" was dated November 9, 1990 and parallels the oral presentation of the Commissioner whose oral report and recommendation was adopted by the Commission by vote on July 11, 1990.

(7) Adamar improperly extended Rood's reinstated credit limit in violation of *N.J.A.C.* 19:45–1.27(a) [Count V] and

(8) Adamar and Gallaway improperly settled Rood's debt without first determining its uncollectibility in violation of *N.J.S.A.* 5:12–101(a)(2) and *N.J.A.C.* 19:45–1.25(a)(2) [Count VI].

These findings were based on the allegations in the first six counts of the complaint. The Commission found no violation of *N.J.S.A.* 5:12–102(m)(4), as alleged in the seventh count. The Commission thus ordered:

1. The Commission finds Adamar liable for the violations alleged in Counts I, II, III, IV, V and VI of the Division's complaint. The recommended penalty of $35,000 for the violations is rejected. Instead, considering the extensive and egregious violations of the credit and credit-related provisions of the Casino Control Act and its attendant regulations, Adamar is prohibited from extending credit to any patron for a period of two business days beginning 10:00 a.m. Saturday, August 18, 1990, and ending 6:00 a.m. Monday, August 20, 1990;

2. The Commission adopts the findings of liability on Count II as to Robert James. However, the recommended sanction of $2,000 for Robert James is rejected and a monetary penalty of $5,000 is imposed; and

3. The Commission finds John Gallaway liable for the violations alleged in Counts III, IV and VI of the DGE's complaint. A monetary penalty of $10,000 is imposed.

The Commission further ordered that "in view of the finding of liability on Count III and disallowance of the $500,000 write-off, the Division of Financial Evaluation and Control shall ensure that the necessary adjustments are made to the Casino Revenue Fund." [3]

As noted by the A.L.J., "[m]ost of the facts are either stipulated or undisputed." [4] They were summarized by the A.L.J. as follows:

[3] It would have been helpful for the Commission to have assessed sanctions on a count-by-count basis. That approach would prevent the creation of issues in the event that we were to agree with the Commission on some but not all of its conclusions as to liability.

[4] The Reporting Commissioner, whose recommendation was adopted by the Commission on July 11, 1990, expressly adopted "the facts as found by the A.L.J." The "Commission Decision", dated November 9, 1990, also found "no disputed factual issues" and stated "we adopt the facts as found by the ALJ."

... In November 1982, Patron Rood was granted a credit line at Tropicana in the amount of $100,000. Patron Rood was senior partner in the law firm of Rood & Associates located in Tampa, Florida. As of late February 1986, Patron Rood's credit account reflected a credit limit and outstanding balance of $850,000. On March 1, 1986, revisions to *N.J.A.C.* 19:45–1.27(a) became effective. This new credit regulation required casinos to obtain and verify additional information regarding a credit patron's identification and credit worthiness. From March 25, 1986 through May 24, 1986, Patron Rood received five permanent credit limit increases to his approved credit line. These increases raised his outstanding credit account from $850,000 to $1,350,000. At the time of each such increase, the credit department obtained derogatory information concerning Patron Rood from CCLV and from independent contact with several New Jersey casinos. These sources indicated that on each such occasion, Patron Rood had unpaid credit debts at six different New Jersey casinos totalling approximately $1,500,000, and that his credit accounts at these casinos had been cancelled in each case during 1985.

Mr. Rood's credit file contains an uncertified financial statement dated February 1985 which shows total net worth in excess of $41,000,000 and available cash of $180,000. Most of his wealth was in the form of real estate and oil wells. From 1982 until his checks began to return in June 1986, Patron Rood had gambled approximately $40,000,000 at Tropicana and had lost approximately $7,500,000.

On June 20, 1986, Patron Rood's credit account at Tropicana was suspended due to a returned check. From this date to October 7, 1986, a total of 24 counterchecks and personal checks totalling $1,225,000 were returned unpaid to Tropicana. Patron Rood also owed $225,000 to Tropicana West located in Las Vegas, Nevada.

On the same day that his first check returned, Tropicana's collection department established a collection file for Patron Rood. Entries in the file indicate that from this date until May 20, 1987, eight of ten collection statements sent, went to Robert M. James. Respondent James was vice president of casino operations at the time and was not a member of the collections department. Maureen Cullen Keenan, former collections manager, and Leanor A. Mazzeo-Amoriello, the current collections manager, confirmed in testimony that the file would have contained notations that collection statements were sent to Patron Rood had they been. Respondent John M. Gallaway in a memorandum of July 15, 1986 to Steven R. Bolson, Tropicana vice president and in-house counsel, referring to the Rood matter indicates that respondent James "was doing everything he can to work out an equitable arrangement with Patron Rood, in order to get the money owed us as soon as possible".

Former collections manager Keenan described respondent James [1] role in the Rood matter as that of "a messenger" to prompt him to pay his outstanding debt. Lester Brzozowski, Vice President of Finance, with oversight responsibility for the collections department, referred to him as the "customer contact" and Steven Bolson testified that respondent James was a "middleman and contact person only". Respondent James and Patron Rood were personal friends. There is no indication in the file that collection efforts were made by

anyone other than respondent James in the early months after checks began to return. Mr. James was not present at the hearing and did not testify.

There were 13 separate dates between June 20, 1986 and October 7, 1986 on which checks returned. The CCLV was not notified at all, and the file contains the notation "no derog" or similar language on five of these dates indicating that someone made a decision not to report the matter. Former collections manager Keenan testified that she did not make this decision, and was unaware of it, but that she had expected Patron Rood to come in and make good on these returned checks. When current collections manager Mazzeo–Amoriello took over the Department in November 1986, she discovered the error and on December 3, 1986 reported to CCLV that $1,225,000 had returned.

In a memorandum dated July 25, 1986, Steven R. Bolson advised respondent Gallaway as to the status of collection efforts in Patron Rood's account. He opined that the matter was being handled in compliance with the regulatory framework, and that more aggressive and/or formal collection efforts were neither necessary or legally required at that time.

In a Memorandum of October 16, 1986 to respondent Gallaway, Mr. Bolson again advised after a telephone call with Mr. Rood that real estate owned by Rood was in the process of being sold and that part of the proceeds would be used to pay Tropicana's debt. He recommended that Tropicana refrain from formal efforts to perfect a security interest in the property until the end of the year.

By December 11, 1986, Mr. Bolson was less sanguine. Tropicana retained Florida counsel, and in a letter of this date to counsel, Mr. Bolson set out the problem and expressed Tropicana's desire to perfect a security interest in real property owned by Mr. Rood. He noted that although Mr. Rood had represented his willingness to pay the debt in full, at this point formal steps toward this end had become necessary.

On December 17, 1986, collections manager Mazzeo–Amoriello and Mr. Bolson travelled to Florida to meet with counsel and Mr. Rood to inspect certain real estate and discuss repayment of the debt. During their meeting and for the first time, Mr. Rood raised the question of discounting $500,000 of his total debt of $1,450,000 in return for the security interest which Tropicana sought.

In January 1987, after considering the matter and receiving Mr. Bolson's advice that this would be legal, and the advice of the credit committee that it was prudent, respondent Gallaway approved the settlement. In a memorandum of January 13, 1987 Mr. Bolson informed Mr. Brzozowski that the appraisals received confirmed that the value of the land exceeded the debt. A note mortgage and escrow agreement were executed on January 20, 1987, and by their terms Patron Rood was obliged to pay $950,000 by June 15, 1987, or Tropicana would perfect a security interest in this real estate for the entire debt. In a memorandum of February 5, 1987 Mr. Bolson informed Mr. Brzozowski that the agreement had been executed. On May 20, 1987, Patron Rood wired $950,000 to Tropicana. Respondent Gallaway applied $725,000 to the debt owed respondent Tropicana and paid in full the $225,000 to Tropicana West. On May 29, 1987, the $500,000 was written off as "bad debt" pursuant

to a write off memorandum signed by respondent Gallaway. Florida counsel were paid $30,000 for their efforts.

From June 20, 1986 when his checks began to return, until May 29, 1987 when his credit was reinstated, Patron Rood was a cash player at Tropicana. The player trip history form for him shows that he played over 200 hours during this period, had an average bet of $2,179 and wagered a total amount of $805,000 in cash and $846,000 in chips.

On May 29, 1987 respondent Gallaway reinstated Mr. Rood's credit line at $50,000. The CCLV reports at the time indicated that Patron Rood owed a total of $1,170,000 to six Atlantic City casinos and his credit at these establishments continued to be suspended. Thereafter, Mr. Gallaway and the credit committee determined that Mr. Rood could lose no more than $100,000 in any weekend trip. From May 29, 1987 through May 13, 1988, Patron Rood received four permanent credit increases and one temporary credit increase at Tropicana which raised his credit limit to $330,000. During this period Patron Rood lost over $1,000,000 as a player. At each point that credit was increased, the CCLV reported to Tropicana that Patron Rood owed other casinos in the vicinity of $1,000,000. On June 22, 1988, checks drawn by Patron Rood on this reinstated credit line began returning. On June 23, 1988, credit was suspended and the derogatory information reported to CCLV. When all the checks had returned, Patron Rood owed Tropicana $330,000. The file reflects that monthly statements were now sent directly to Patron Rood and on October 17, 1988, Mr. Bolson advised him in a letter that unless payment was forthcoming, suit would be instituted. On February 9, 1989, an action was filed in Superior Court and a judgment was obtained for the amount in question. At the time of hearing, two payments of $5000 each, had been received by Tropicana.

On June 29, 1988, Tropicana wired funds to a Florida automobile dealer to provide a gift complimentary to Patron Rood of a 1988 Cadillac Eldorado. The purchase price was $25,122.81. The reason recorded in the file was "birthday gift-Ed Rood". To this point, the facts are undisputed.

The A.L.J.'s decision also referred to testimony of Tropicana's attorney Bolson and its president, appellant Gallaway.

Mr. Bolson testified that he became actively involved in the matter at Mr. Gallaway's request in the fall of 1986. He had many telephone conversations with Mr. Rood, in which Rood assured him that full payment would be forthcoming. They also discussed the possibility of a security interest in real property about to be sold in Florida by Mr. Rood, but when the sale was delayed, Mr. Gallaway sent him to Florida to see how he could move the matter along.

Mr. Bolson testified that his advice to Mr. Gallaway that the settlement was legal and proper was based on a number of factors. Tropicana had made substantial efforts to collect the entire debt but it was plain from his conversation with Mr. Rood in Florida that although he regretted the circumstances, if Tropicana wanted to secure its debt it would have to pay for that peace of mind. Mr. Bolson considered the fact that Mr. Rood was 72 years old, and in case of his death, Tropicana could expect a dispute with his heirs. Further, the debt

would have to be collected in Florida, where there was some question at the time about the collectability of gambling debts. Finally even if formal collection efforts were instituted and were ultimately successful, Tropicana would expend large sums in attorney's fees and costs. Mr. Bolson had taken this same view with respect to Mr. Rood's debt in September 1985, when he wrote a memorandum on this same subject, although at that time no settlement took place.

Mr. Gallaway testified that he concluded reluctantly based on this advice and discussion at credit committee meetings, that a settlement was in Tropicana's best interest. He then reestablished Patron Rood's credit line at the patron's request but with limitations. He and the credit committee decided that no more than $100,000 in credit would be granted in any one weekend. This level of credit was justified by Patron Rood's net worth which was still substantial. When checks began to return again, Rood advised Tropicana that his assets were now effectively frozen as a result of judgments obtained by various Federal agencies, and that at this point he could not pay. He expressed a continuing desire to pay as soon as these difficulties were behind him.

Mr. Gallaway testified that during the entire period which bound these charges, Mr. Rood was always available, answered calls, and generally was open about his responsibilities. This is in sharp contrast to the norm at the debt collection end of the business. He and the other key personnel assisting in these credit decisions considered Mr. Rood to be an honorable person and accountable to his word. This is the substance of the record.

■ Tropicana and Gallaway argue that the Commission violated their procedural due process rights, as guaranteed under the constitution and the Administrative Procedures Act, *N.J.S.A.* 52:14B-1 to -15, when it "unilaterally imported the previously uncharged allegations into the proceedings where such violations were never in issue before", so that "Tropicana was given absolutely no opportunity to meet the new charges leveled against it; the Commission made and decided the accusations for the first time in its oral decision."

■ It is true, as appellants contend, that *N.J.A.C.* 19:45–1.27(f)(3) and *N.J.A.C.* 19:45–1.27(i) are not cited in the complaint.[5] However, they were not the regulations under which

[5]Nowhere in the record is there a copy of either regulation as it existed at the relevant times. Plaintiffs capsulize the pertinent requirement to be as follows: "N.J.A.C. 19:45–1.27(f)(3) ... requires a casino to provide in its credit file '[t]he reason credit was approved if derogatory information was obtained during the

the Commission based its finding and were considered only to the extent relevant to the "conduct under [the] counts," as charged, notably under *N.J.A.C.* 19:45–1.27(a). We find no inappropriate action by the Commission's so doing. *Cf. State v. Bander*, 56 *N.J.* 196, 201–202, 265 *A.*2d 671 (1970). In any event, the undisputed evidence was clear that various regulations were violated by the extension of credit to Rood, a Tampa, Florida attorney and sportsman, when he was in substantial debt to Tropicana and other casinos. It may well be that Rood chose to gamble in lieu of otherwise spending his considerable wealth and that Tropicana, at the time, expected an ultimate payment of the debt stemming from returned checks, even after it had accepted a prior settlement of outstanding debt. But even so, that was no excuse to violate the debt reporting, credit extension and debt collection procedures established by regulation.

There is an adequate basis in the record to sustain the Commission's findings. As we said in *In re Adamar of New Jersey*, 222 *N.J.Super.* 464, 537 *A.*2d 704 (App.Div.1988):

> Generally, we are not bound by an agency's determination of a strictly legal issue. However, we accord substantial deference to an interpretation of a statute or regulation by the agency responsible for enforcing it. Further, we must defer to the administrative agency's expertise in relation to technical matters....

> Moreover, statutes and regulations promulgated thereunder must be read so as to implement the legislative intent permitted by statute.... In that regard, our Supreme Court has recognized "the strong state interest in promoting scrupulous conduct by the casino industry and regulatory officials." ... Further, the Law Division in *Playboy–Elsinore Assocs. v. Strauss*, 189 *N.J.Super.* 185, 191 [459 *A.*2d 701] (Law Div.1983), noted that "practices and procedures involved with the extension of credit by the casinos are among the most sensitive aspects of casino operations." [222 *N.J.Super.* at 469–470, 537 *A.*2d 704 (citations omitted)].

Thus, *N.J.S.A.* 5:12–101 has been construed to "narrowly circumscribe[ ] the manner by which credit shall be offered to patrons." *See In re Adamar, supra* 222 *N.J.Super.* at 470, 537

---

verification process,' and N.J.A.C. 19:45–1.27(i) ... mandates reverification of information in the credit file."

*A.*2d 704; *see also N.J.A.C.* 19:45–1.25 to –1.29 (implementing that intent).

Considering the overall legislative scheme with regard to credit issuance and debt collection, it cannot be said that the Commission's interpretation of its regulation or its findings were arbitrary and capricious. In fact, the regulations are not themselves the subject of any facial attack. Moreover, the Commission's findings with respect to the violations are supported by the record.

■ Count one of the Amended Complaint expressly states that this charge related to Tropicana's "extending credit without adequate supporting information in the patron's credit file to justify said extensions of credit." Adequacy of information formed the basis of the charge. More specifically, the basis of the charge was that "[t]hese extensions of credit were not adequately supported by the information contained in the patron's credit file nor was the significant derogatory credit information obtained during the verification process adequately explained to support the extensions of credit to patron Rood...." Thus, the missing information was as critical to the violation as the information provided.

The effect of the lack of explanatory information to address the uncontested "derogatory information" was expressly commented on by the Commission when it noted that Tropicana "chose to ignore its implications" by not recording in the credit file "the reason credit was approved if derogatory information was obtained during the verification process." Whether Tropicana chose to ignore such information or not is not dispositive. The fact remains that there was no explanatory information supporting the ultimate decision included in the file as required. Irrespective of the further comment by the Commission that "[t]he decision to increase Rood's credit limits was in flagrant disregard of the credit regulation and the principles which underlie the revision of those regulations" and the ensuing

discussion on the soundness of that decision, the fact is that the file was incomplete.

Regarding count two, the only count the A.L.J. found to have been sustained, the Commission noted: "It is undisputed that James, then a vice president of casino operations involved in the issuance of credit, could not perform collection efforts. Nevertheless, eight of 10 ... collection statements went directly to James, instead of patron Rood." This is clearly in violation of *N.J.A.C.* 19:45–1.29(b) and *N.J.A.C.* 19:45–1.29(e). Similarly, a violation of *N.J.A.C.* 19:45–1.27(j) was conceded by Tropicana, inasmuch as thirteen reported incidents of checks returned for insufficient funds in the period between June 20, 1986 and October 7, 1986 were not reported to CCLV until December 3, 1986. The findings on count two are therefore unassailable.[6]

With respect to the Commission's finding that plaintiffs had violated *N.J.A.C.* 19:45–1.29(j) as charged in count three, the evidence on the record supports the finding that reasonable efforts were not pursued, as Tropicana did not comply with the relevant regulations, *see N.J.A.C.* 19:45–1.29(b)(e), as sustained under count two. *N.J.A.C.* 19:45–1.29(j) provides that "[a]fter *reasonable* collection efforts, returned checks may be considered uncollectible for accounting purposes and charged to the casino's licensee's allowance for uncollectible patron's checks." (emphasis added). As improper procedures were utilized in the collection process, we cannot disagree with the Commission's conclusion that the efforts were unreasonable.

The Commission found that appellants violated *N.J.A.C.* 19:45–1.27(a), as charged in count four, by the reinstituting credit to Rood on May 29, 1987 notwithstanding 1) the derogatory information contained in his CCLV file; 2) the fact he owed $1,170,000 to other casinos at the time, and 3) the $950,000

---

[6]Tropicana does not really specifically argue the contrary regarding the A.L.J.'s sustaining of this count.

settlement with Rood paid on May 20, 1987. The Commission's finding is supported by the record. The same is true of the related charge under *N.J.A.C.* 45:19–1.27(a) under count five. There is no suggestion of double punishment for these violations. One dealt with the granting of credit, the other with subsequent increases or extensions. Tropicana did not have the required credit information in the file to ever get the benefit of a "deferential business decision." Further, in finding a violation of these counts by Gallaway, the Commission found that he "personally reinstated Rood's credit" knowing, among other things, "that Rood could not or would not pay his 1986 gaming debts in full."

There is also sufficient evidence to support the Commission's findings that appellants violated *N.J.S.A.* 5:12–101a(2) and *N.J.A.C.* 19:45–1.25(a)(2) by releasing or discharging "$500,000 of Rood's debt . . . without determining its uncollectibility," *i.e.* taking a "write-off" despite collection violations.

In reporting on count six, the Commissioner whose recommendation was adopted by the Commission as a whole stated:

In Count Six the DGE alleged that both Tropicana and Gallaway improperly discharged $500,000 of Rood's debt without determining its uncollectibility as required by *N.J.S.A.* 5:12–101(a)(2) and *N.J.A.C.* 19:45–1.25(a)(2). Both the statute and the regulation require that the licensee maintain written records of the deposit, check return and collection efforts prior to writing off a debt as uncollectible.

The ALJ found that Tropicana's failure to send collection statements did not bar the respondents from entering into a settlement and write-off. If it did, he reasoned, it would be tantamount to punishing the respondents twice for the same regulatory infraction. The ALJ concluded that the settlement and write-off must stand or fall on its own.

Once again, I disagree with the ALJ's approach to the alleged violation. The logic of finding collection violations but nevertheless permitting the write-off, eludes me. I do not find it double punishment to disallow a write-off where the casino licensee failed to follow proper collection procedures. On the contrary, as I indicated earlier, I believe the collection violations preclude the allowance of a write-off. Were it otherwise, Tropicana would reap the benefits from its own regulatory violations. Moreover, *N.J.A.C.* 19:45–1.25(a)(2) requires compliance with *N.J.A.C.* 19:45–1.29 as a precondition to discharge of a gaming debt. Thus, contrary to the ALJ's rationale, failure to adhere to the collection regulation is precisely the reason to disallow the settlement, rather than

sanction it. The initial decision should therefore be modified to find that Tropicana and John Gallaway improperly settled Rood's debt in violation of Section 101(a)(2) of the Act and *N.J.A.C.* 19:45–1.25(a)(2).[7]

The appellants contend that there is no regulation authorizing the disallowance of the $500,000 write-off. The Division and Commission seem to argue otherwise and contend that if the write-off were not disallowed, Tropicana would benefit by the violation of the regulations, and the regulations would have no sanction if the violation of the write-off provisions could not be punished by a disallowance of the very write-off. As the reporting Commissioner stated, "[w]ere it otherwise, Tropicana would reap the benefits from its own regulatory violations." However, the reporting Commissioner did not talk about the disallowance of the write-off as the sanction to be imposed by the Commission under count three. The sanction is also referred to in the Commission's decision at the time of the discussion of count six.

With respect to the recommended penalties against Gallaway and Adamar, the reporting Commissioner stated:

> Our decision to find liability and impose sanctions against John Gallaway is precedent setting only in the sense that in no other case have sanctions been imposed against an individual of Mr. Gallaway's corporate statute. Nevertheless, they are clearly warranted here. Mr. Gallaway personally authorized both the discounted settlement and the reinstatement of Rood's credit following payment under the discounted settlement agreement, action which violated Commission regulations. Therefore, he is personally accountable for serious violations. Accordingly, the initial decision should be modified to impose a sanction of $10,000 against Mr. Gallaway.
>
> . . . .
>
> Examining the criteria in Section 130 of the Act, I find Tropicana's misconduct warrants a severe regulatory response. By failing to comply with Commission regulations the casino demonstrated that it was willing to go to great lengths to retain Rood's patronage. As required by our regulations, other casinos reported Rood's derogatory information to the Casino Credit Bureau. Furthermore, these other casinos complied with the regulations which precluded any further extension of credit to Rood. By failing to do likewise, Tropicana

---

[7] The subsequent written decision of November 9, 1990 is similar with modifications to refer to the Commission as opposed to the reporting Commissioner.

ensured that he could continue playing on credit only at that facility, to the exclusion of those casino licensees which abided the credit regulations. The inescapable inference that I alluded to earlier is that Tropicana was motivated by the desire to monopolize what it considered a preferred patron. Tropicana eliminated the competition and was satisfied with any return it might get on the improperly extended credit.

Moreover, with knowledge that Rood was experiencing financial difficulty, Tropicana continued to extend his credit. Compliance with our extensive system of regulations was intended to eliminate the practice of burying a patron, which emerged so prominently during the SCI hearings. In the seven years that Rood patronized the Tropicana, he lost and paid in excess of $7,000,000. While there are clear indications that other noncasino problems, particularly with the federal government, contributed to Rood's ultimate financial downfall, Tropicana's liberal extensions of credit without proper regard for regulatory compliance were undeniably a major factor.

Moreover, Tropicana's failure to adhere to credit regulations was deliberate, ongoing and willful. There was nothing unintentional or unknowing about its misconduct. Neither does this record establish that it has engaged in any corrective action.

In circumstances such as these, a strictly monetary penalty could rightly be viewed as a mere cost of doing business. It bears repeating that Rood lost and hence Tropicana won approximately $7,000,000. Where, as here, the casino licensee has demonstrated a conscious disregard for regulations that were designed and implemented to prevent the very harm which resulted, more than a financial sanction is required. I believe the sanction should be tailored to the violation. Because Tropicana abused the credit provisions, its ability to extend credit should be restricted. Such a penalty will serve notice both to this licensee and others of the importance of strict compliance with the regulations governing casino credit.

Upon consideration of the entire record in this case, I would propose that Tropicana's ability to extend credit be suspended for a period of two gaming days. I would move that the initial decision be modified in accordance with my foregoing remarks and, further, that Tropicana be prohibited from extending any credit to any patron for two business days beginning 10:00 a.m. on Saturday, August 18, 1990 and ending 6:00 a.m. on Monday, August 20, 1990.

The subsequent written decision provided the same.

The Commission adopted the recommendation of the reporting Commissioner by a vote of four to one. However, in addition to the dissent of Commissioner Dodd, Commissioner Hurley, in voting for the recommendation, indicated "that on Count One and Three" he "concur[red] with the conclusions reached by the Administrative Law Judge" and took "exception to the motion before us with respect to those two counts." Therefore, we understand that he joined in the $10,000 sanction

against Gallaway and the two day loss of privileges against Adamar, but may well have disagreed with the imposition of any sanctions for the violation of count three and, therefore, the "write off" disallowance, even though he did not express disagreement with the conclusion on count six. The resolution of the Commission as ultimately adopted refers to the required "adjustments" to the Casino Reserve Fund "in view of the finding of liability on Count III and disallowance of the $500,-000 write-off." It does not expressly refer to the disallowance as a sanction under count three or count six, or both. At the end of its written "decision" dated November 9, 1990, which is essentially the oral report and recommendation as adopted on July 11, 1990, it is noted that "James R. Hurley supports the majority decision on all counts but Counts III and VI of the complaint." While no argument is addressed to us on this difference, we will presume that Commissioner Hurley, like Commissioner Dodd, dissented from the write-off disallowance and that the vote on that subject was 3–2. However, it is clear that the majority adopted it, and we must review only the propriety of the majority decision.

Before us, appellants contend that the disallowance was not authorized by regulation and that regulation is necessary because that sanction would otherwise constitute "rulemaking", as opposed to an authorized adjudication in the particular case.[8] The argument does not seem to have been advanced before the Commission, or as clearly in the briefs as it was at oral argument before us.

The leading case is *Metromedia Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 478 *A.*2d 742 (1984), in which our Supreme Court concluded "that in the case of a multi-state

---

[8]Appellants do not contest, as such, the authority of the Commission to impose the other sanctions or the penalties imposed, other than the disallowance. *See N.J.S.A.* 5:12–129(4) (authorizing suspension of operations altogether) and 12–129(5) (authorizing civil penalties of up to $10,000 against individual licensees and $50,000 against casinos).

television and radio station enterprise whose broadcast operations cover audiences in New Jersey, the [New Jersey Corporation Business Tax] Act permits the discretionary choice by the Director [of the Division of Taxation] to compute the corporate taxpayer's receipts attributable to New Jersey by the application of a factor based upon an 'audience share' in this state." 97 *N.J.* at 327–328, 478 *A.*2d 742. However, the Court also concluded that "the agency determination to apply the audience share factor in allocating taxpayer's receipts to New Jersey encompassed *de facto* rule-making" which had to be adopted in accordance with requirements embodied in the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15. Thus, although the "audience factor" was determined to "constitute" a fair and appropriate method for allocating revenues, 97 *N.J.* at 338, 478 *A.*2d 742, the Supreme Court emphasized that "[t]he actual determination to use such an allocation method ... requires implementing regulations and recourse to rule-making procedures", *id.* In reaching that holding, the Supreme Court established the factors that must be considered by an administrative agency in determining when implementation of the "rule-making" process is required:

> Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication, or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication. [97 *N.J.* at 331–332, 478 *A.*2d 742].

It is clear that a majority of the Commission adopted the recommendation of the reporting Commissioner and the disallowance of the write-off. We conclude that the disallowance of

the write-off was an adjudication on the facts based upon the Commission's reasonable determination of the proper penalty to be imposed. The write-off violated the regulations due to the absence of a reasonable endeavor to collect the underlying debt in conformity with the governing regulations. As the reporting Commissioner noted, if the write-off could not be disallowed then there would be no meaningful sanction for the violation of the regulations. The written decision states the same:

> The logic of finding collection violations but, nevertheless, permitting the write-off eludes us. We do not find it double punishment to disallow a write-off where the casino licensee failed to follow proper collection procedures. On the contrary, as previously indicated, we believe the collection violations preclude the allowance of a write-off. Were it otherwise, Tropicana would reap benefits from its own regulatory violations. Moreover, *N.J.A.C.* 19:45–1.25(a)(2) requires compliance with *N.J.A.C.* 19:45–1.29 as a precondition to discharge of a gaming debt. Thus, contrary to the ALJ's rationale, failure to adhere to the collection regulation is precisely the reason to disallow the settlement, rather than sanction it.

We find the rationale to be reasonable based on the regulations. We also conclude that the penalty of disallowance conforms with the administrative policy embodied in the governing regulation relating to write-offs. The Legislature expressly invested the Commission with broad powers to impose sanctions, including penalties upon "persons" (including all types of entities, *N.J.S.A.* 5:12–37) "for any cause deemed reasonable by the commission pursuant to rules and regulations promulgated thereby...." *N.J.S.A.* 5:12–64. Further, the absence of a regulation expressly authorizing the particular sanction is not dispositive. The Legislature has created certain "sanctions" for violations of the Casino Control Act. *See N.J.S.A.* 5:12–111 to –130. It also authorized the Commission to impose additional specific types of sanctions "after appropriate hearings and factual determinations", *N.J.S.A.* 5:12–129. These sanctions include revocation and suspension of licenses. Among other things, the Commission may "[o]rder restitution of any moneys or property unlawfully obtained or retained by a licensee or registrant." *N.J.S.A.* 5:12–129(6). Moreover, *N.J.S.A.* 5:12–75 provides that:

The Commission may exercise any proper power or authority necessary to perform the duties assigned to it by law, and no specific enumeration of powers in [the] act shall be read to limit the authority of the commission to administer [the] act.

Where, as here, "the [agency] action is inferable from the enabling statute itself and does not reflect a new or changed position, it will not be held invalid for failure to meet rule-making procedural requirements. *See Airwork Serv. Div. etc. v. Director, Div. of Taxation,* 97 *N.J.* 290, 301 [478 *A.*2d 729] (1984) [*cert. den.* 471 *U.S.* 1127, 105 S.Ct. 2662, 86 *L.Ed.*2d 278 (1985)]." *In re 1982 Final Reconciliation Adj. for Jersey Shore Medical Center,* 209 *N.J.Super.* 79, 87, 506 *A.*2d 1269 (App.Div.1986). *Accord, St. Barnabas Med. Ctr. v. New Jersey Hospital Rate Setting Comm'n,* 250 *N.J.Super.* 132, 144, 593 *A.*2d 806 (1991). *See also Matter of Hotel and Restaurant Emp. and Bart. Int'l,* 203 *N.J.Super.* 297, 346–351, 496 *A.*2d 1111 (App.Div.), *certif. den.* 102 *N.J.* 352, 508 *A.*2d 223 (1985) (upholding a Commission order disqualifying individuals from serving as officers, agents and principal employees of unions associated with the casino industry).

■■ In summary, we cannot disturb the decision of an administrative agency unless its conduct is arbitrary, capricious or unreasonable or is not supported by the record. *See e.g., Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–580, 410 *A.*2d 686 (1980); *Campbell v. Dept. of Civil Service,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *In re Adamar, supra.* Further, we review in this context only the determination of the agency. *Public Advocate Dep't v. Public Utilities Bd.,* 189 *N.J.Super.* 491, 507, 460 *A.*2d 1057 (App.Div.1983). This is particularly so where the underlying issues do not involve the conduct of the agency itself. *See Steinmann v. Dept. of Treasury,* 235 *N.J.Super.* 356, 361, 366–367, 562 *A.*2d 799 (App.Div.1989), *rev'd* 116 *N.J.* 564, 567, 562 *A.*2d 791 (1989). Hence, although their positions may well be reasonable in light of the record, the views of the A.L.J. and Commissioners Dodd and Hurley do not control, and we are not free to substitute their position for that

of the majority of the agency which we review based on our limited jurisdiction.

Accordingly, we affirm the judgment of the Casino Control Commission.